**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| In re:<br><br>ANGSTROM ALUMINUM CASTINGS TEXAS, LLC,<br><br>Debtor. | §<br>§<br>§<br>§<br>§<br>§ | Chapter 11<br><br>Case No. 26-60766-mmp |
| ANGSTROM ALUMINUM CASTINGS TEXAS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>TESLA, INC.,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adv. Proc. No. 26-06013-mmp |

**TESLA, INC.'S ANSWER TO ORIGINAL PETITION AND TESLA'S ORIGINAL COUNTERCLAIMS**

Defendant Tesla, Inc. ("Tesla") hereby files this Answer to Angstrom Aluminum Castings Texas, LLC's ("Angstrom" or the "Debtor") Original Petition and Tesla's Original Counterclaim, and respectfully shows the Court as follows:[1]

**GENERAL DENIAL**

Pursuant to Federal Rule of Civil Procedure 8(b), Tesla denies each and every allegation, averment, and characterization in the Original Petition that is not expressly admitted below. Any

[1] This Answer is timely pursuant to Federal Rule of Bankruptcy Procedure 9027(g)(2)(C) because it is filed within 7 days after the notice of removal was filed.

factual allegation admitted herein is admitted only as to the specific facts stated, and not as to any conclusions, characterizations, inferences, or implications that the Debtor may draw therefrom.

## RESPONSES TO NUMBERED PARAGRAPHS

### I. DISCOVERY CONTROL PLAN[2]

1. Paragraph 1 states legal conclusions that do not require a response.

### II. PARTIES

2. There are no allegations pertaining to Tesla in this paragraph that require a response. Further, Tesla lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 2.

3. Tesla denies the allegation in Paragraph 3 of the Original Petition that it is a Delaware corporation. Tesla admits the remaining allegations in Paragraph 3.

### III. STATEMENT OF RELIEF SOUGHT

4. Paragraph 4 states legal conclusions to which no response is required. Tesla denies that the Debtor is entitled to the monetary relief sought.

### IV. JURISDICTION AND VENUE

5. Paragraph 5 states legal conclusions to which no response is required. To the extent further response is required, Tesla admits this Court has subject matter jurisdiction over this dispute to the extent the reference has not already been withdrawn to the District Court, subject to any right of Tesla to seek to withdraw the reference to the District Court.

---

[2] Tesla recreates the Original Petition's headings for organizational purposes only and not as an admission or indication of Tesla's agreement with the headings or any characterizations therein.

6. Paragraph 6 states legal conclusions to which no response is required. To the extent further response is required, Tesla admits this Court is a proper venue for this dispute to the extent the reference has not already been withdrawn to the District Court, subject to any right of Tesla to seek to withdraw the reference to the District Court.

## V. FACTUAL ALLEGATIONS

7. Tesla admits that the Debtor was a manufacturer of automotive parts.

8. Tesla denies the allegations in Paragraph 8 of the Original Petition.

9. Tesla denies the allegations in Paragraph 9 of the Original Petition.

10. Tesla denies the allegations in Paragraph 10 of the Original Petition pertaining to Tesla. Tesla is without sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 10 of the Original Petition.

11. Tesla denies the allegations in Paragraph 11 of the Original Petition.

12. Tesla is without sufficient information or knowledge to admit or deny the allegations in Paragraph 12 of the Original Petition.

13. Tesla denies the allegations in Paragraph 13 of the Original Petition.

14. Tesla admits the allegations in Paragraph 14 of the Original Petition.

15. Tesla admits that it issued purchase orders to the Debtor and that the purchase orders speak for themselves. Tesla denies any remaining allegations in Paragraph 15 of the Original Petition.

16. Tesla denies the allegations in Paragraph 16 of the Original Petition.

17. Tesla admits that Tesla's General Terms and Conditions are binding on Tesla and the Debtor and that Tesla has contractual rights concerning tooling and equipment. Tesla denies any other allegations in Paragraph 17 of the Original Petition.

18. Tesla admits that it demanded possession of its tooling and equipment. Tesla denies any other allegations in Paragraph 18 of the Original Petition.

19. Tesla denies the allegations in Paragraph 19 of the Original Petition.

20. Tesla denies the allegations in Paragraph 20 of the Original Petition.

21. Tesla denies the allegations in Paragraph 21 of the Original Petition.

22. Tesla admits that it has contractual rights to the tooling and equipment and that the contractual provisions speak for themselves. To the extent any additional response is required, Tesla denies the remaining allegations in Paragraph 22 of the Original Petition.

23. Tesla denies the allegations in Paragraph 23, including subparts a–d, of the Original Petition.

24. Paragraph 24 of the Original Petition consists of legal conclusions that do not require a response. To the extent any additional response is required, Tesla denies the allegations in Paragraph 24 of the Original Petition.

25. Tesla admits that it contracted with the Debtor to manufacture parts for Tesla vehicles. Tesla denies the remaining allegations in Paragraph 25 of the Original Petition.

26. Tesla denies the allegations in Paragraph 26 of the Original Petition.

27. Tesla denies the allegations in Paragraph 27 of the Original Petition.

28. Tesla denies the allegations in Paragraph 28 of the Original Petition.

29. Tesla denies the allegations in Paragraph 29 of the Original Petition.

30. Tesla denies the allegations in Paragraph 30 of the Original Petition.

31. Tesla denies the allegations in Paragraph 31 of the Original Petition.

32. Tesla denies the allegations in Paragraph 32 of the Original Petition.

33. Tesla denies the allegations in Paragraph 33 of the Original Petition.

34. Tesla denies the allegations in Paragraph 34 of the Original Petition.

35. Tesla denies the allegations in Paragraph 35 of the Original Petition.

36. Tesla denies the allegations in Paragraph 36 of the Original Petition.

37. Tesla denies the allegations in Paragraph 37 of the Original Petition.

**COUNT I**
**PROMISSORY ESTOPPEL**

38. Paragraph 38 of the Original Petition states legal conclusions to which no response is required.

39. Tesla denies the allegations in Paragraph 39 of the Original Petition.

40. Tesla denies the allegations in Paragraph 40 of the Original Petition.

41. Tesla denies the allegations in Paragraph 41 of the Original Petition.

42. Tesla denies the allegations in Paragraph 42 of the Original Petition.

43. Tesla denies the allegations in Paragraph 43 of the Original Petition.

44. Tesla denies the allegations in Paragraph 44 of the Original Petition.

45. Tesla denies the allegations in Paragraph 45 of the Original Petition.

46. Tesla denies the allegations in Paragraph 46 of the Original Petition.

47. Tesla denies the allegations in Paragraph 47 of the Original Petition.

48. Tesla denies the allegations in Paragraph 48 of the Original Petition.

**COUNT II**
**DECLARATORY JUDGMENT**
**(Ownership and Possession of Tooling and Equipment)**

49. Paragraph 49 of the Original Petition states legal conclusions to which no response is required.

50. Paragraph 50 of the Original Petition states legal conclusions to which no response is required.

51. Tesla denies the allegations in Paragraph 51 of the Original Petition.

52. Tesla admits that it owns tooling and equipment formerly located at the Debtor's facility. Tesla denies the remaining allegations in Paragraph 52 of the Original Petition.

53. Tesla admits that it demanded access to the Debtor's facility to take possession of its tooling and equipment. Tesla denies the remaining allegation in Paragraph 53 of the Original Petition.

54. Tesla admits that the Debtor disputes Tesla's ownership. Tesla denies the remaining allegations in Paragraph 54 of the Original Petition.

55. Tesla denies the allegations in Paragraph 55 of the Original Petition.

56. Tesla denies the allegations in Paragraph 56 of the Original Petition.

57. Tesla denies the allegations in Paragraph 57 of the Original Petition.

58. Tesla denies the allegations in Paragraph 58 of the Original Petition.

59. Tesla denies the allegations in Paragraph 59 of the Original Petition.

60. Paragraph 60 of the Original Petition at subparts A–F consists of legal conclusions that require no response from Tesla. To the extent any further response is required, Tesla denies

the allegations in Paragraph 60 of the Original Petition, including the factual allegations in subparts A–F.

**COUNT III**
**DECLARATORY JUDGMENT**
**(Tesla's General Terms and Conditions)**

61. Paragraph 61 contains legal conclusions to which no response is required.

62. Paragraph 62 contains legal conclusions to which no response is required.

63. Tesla denies the allegations in Paragraph 63 of the Original Petition.

64. Tesla admits that it has contractual rights to the tooling and equipment, including the right to enter the Debtor's facility. To the extent any further response is required, Tesla denies the remaining allegations in Paragraph 64 of the Original Petition.

65. Tesla admits that the purchase orders speak for themselves. To the extent any further response is required, Tesla denies the remaining allegations in Paragraph 65 of the Original Petition.

66. Tesla admits that the purchase orders speak for themselves. To the extent any further response is required, Tesla denies the remaining allegations in Paragraph 66 of the Original Petition.

67. Tesla denies the allegations in Paragraph 67 of the Original Petition.

68. Tesla denies the allegations in Paragraph 68 of the Original Petition.

69. Tesla denies the allegations in Paragraph 69 of the Original Petition.

70. Tesla admits that it had contractual rights to enter the Debtor's facility and retrieve Tesla's tooling and equipment. To the extent any further response is required, Tesla denies the allegations in Paragraph 70 of the Original Petition.

71. Tesla denies the allegations in Paragraph 71 of the Original Petition.

72. Paragraph 72 of the Original Petition at subparts A–E consists of legal conclusions that require no response from Tesla. To the extent any further response is required, Tesla denies the allegations in Paragraph 72 of the Original Petition, including the factual allegations in subparts A–E.

## PRAYER FOR RELIEF

73. Tesla denies that the Debtor is entitled to the relief sought in its prayer for relief.

## TESLA'S DEFENSES AND AFFIRMATIVE DEFENSES

74. Tesla asserts the following specific denials and/or defenses, without conceding that the defenses are affirmative and without assuming the burden of proof on any defense, element or issue where the burden would otherwise fall on the Debtor:

a. Tesla is entitled to arbitrate all claims in the Original Petition per contract(s) between the parties and otherwise governing the parties' relationship and the claims herein.

b. The Debtor's promissory estoppel claim is barred and fails to state a claim upon which relief can be granted because a valid contract or contracts govern the same subject matter.

c. The Debtor's promissory estoppel claim is barred and fails to state a claim upon which relief can be granted because no clear and definite promise by Tesla occurred to support the Debtor's promissory estoppel claim. For example, the Debtor admits that Tesla expressly declined to commit to purchase a definite or specific quantity of parts from the Debtor and the parties' agreements specifically disclaim any such representations.

d. The Debtor's promissory estoppel claim is time-barred.

e. The statute of frauds bars the Debtor's promissory estoppel claim.

f. Tesla did not orally agree to execute a written contract for the allegedly promised multi-year production program.

g. The Debtor’s promissory estoppel claim fails to state a claim upon which relief can be granted because the Debtor’s reliance, if any, on alleged extra-contractual or oral assurances from Tesla was not reasonable or justifiable. The Debtor and Tesla executed written agreements but did not execute a written agreement for multi-year production program involving specified production quantities as allegedly promised such that any reliance on discussions not reduced to a contract was unreasonable and unjustified.

h. The Debtor did not actually rely on any alleged promise by Tesla to the Debtor’s detriment. The Debtor bought a distressed facility and contacted Tesla following its acquisition. The Tooling is owned by Tesla, as adjudicated in the U.S. District Court in *Tesla, Inc. v. Angstrom Automotive Group, LLC*, No. 6:26-cv-00477 at Dkt. No. 40 (W.D. Tex. August 3, 2026).

i. The Debtor’s promissory estoppel claim fails to state a claim upon which relief can be granted because the Debtor has no reliance damages. The Debtor cannot show that reliance on Tesla’s alleged promise placed it in a worse position. The Debtor’s facility was not profitable even at the time the Debtor acquired it. The Debtor acquired the facility prior to Tesla’s alleged promise. Any damages claimed by the Debtor were caused by the Debtor’s independent business decision. Any alleged promise by Tesla was not a cause of Plaintiff’s losses. Furthermore, the Debtor would have incurred expenditures to begin manufacturing for any new customer such that those costs are not attributable to any alleged promise by Tesla.

j. Merger and/or integration clauses in valid contracts bar the Debtor’s promissory estoppel claim.

k. Disclaimer of reliance clauses in valid contracts bar the Debtor’s promissory estoppel claim.

l. The Debtor’s promissory estoppel claim fails to state a claim upon which relief can be granted because an alleged promise based on speculative future business cannot support a claim for promissory estoppel.

m. The Debtor’s promissory estoppel claim is barred by waiver, ratification, and estoppel because, among other reasons, the Debtor accepted and performed under purchase orders from Tesla contradicting the alleged promise(s) supporting the promissory estoppel claim.

n. The Debtor’s promissory estoppel claim is further barred by unclean hands.

o. The Debtor’s damages, if any, are barred by its failure to mitigate.

p. The Debtor's damages, if any, must be offset or reduced by amounts Tesla has previously paid the Debtor and damages Tesla has incurred as a result of Debtor's actions as outlined in Tesla's counterclaims.

q. The declaratory judgment claim in Count II (as to ownership and possession of Tooling and Equipment) fails because:

   i. No justiciable controversy exists between the parties "concerning ownership of the disputed tooling and equipment." Thus, the Debtor's claim seeks an advisory opinion and is not actionable as a declaratory judgment claim;

   ii. The claim is moot. The District Court in *Tesla, Inc. v. Angstrom Automotive Group, LLC*, No. 6:26-cv-00477 at Dkt. No. 40 (W.D. Tex. August 3, 2026), already determined that Tesla is the owner of the disputed tooling and equipment, ordered that Tesla take possession of the disputed tooling and equipment, and ordered Tesla to enter the Debtor's manufacturing facility for the purpose of removing the disputed tooling and equipment. Tesla completed removal of the disputed tooling and equipment on August 10, 2026;

   iii. Alternatively, the claim fails to identify the specific tooling and equipment at issue with any particularity such that the Court is without adequate information to grant the relief requested; and

   iv. The claim cannot support an attorney's fees award against Tesla under the Texas Uniform Declaratory Judgment Act ("UDJA") because there is no live controversy and because it is duplicative of the contractual rights to be determined in the promissory estoppel claim. Additionally, the Federal Declaratory Judgment Act (28 U.S.C § 2201–2202) ("FDJA") does not include a fee-shifting or fee recovery provision.

r. The declaratory judgment claim in Count III (as to Tesla's General Terms and Conditions) claim fails because:

   i. No justiciable controversy exists between the parties concerning the applicability of Tesla's General Terms and Conditions for Tesla to obtain possession of the Tooling;

   ii. The request for a declaration that "that Tesla is not entitled to rely upon its General Terms and Conditions as the basis for asserting contractual rights unless Tesla establishes the existence of an enforceable agreement incorporating those provisions" is improper. This is merely a request that the Court declare a basic principle of law rather than a declaration on an area of genuine dispute or uncertainty as required under the UDJA;

iii. The claim is moot. The District Court in Tesla, Inc. v. Angstrom Automotive Group, LLC, No. 6:26-cv-00477 at Dkt. No. 40 (W.D. Tex. August 3, 2026), already ordered Angstrom to permit Tesla to retrieve the disputed tooling from the Debtor's facility. Tesla completed removal of Tesla's tooling and equipment on August 10, 2026; and

iv. The claim cannot support an attorney's fees award against Tesla. The claim seeks a declaration on issues that will necessarily be decided in connection with the promissory estoppel claim. Whether a valid and enforceable contract exists, and whether that contract governs the subject matter of the promissory estoppel dispute, are threshold issues for the Debtor and defenses for Tesla that will be resolved through the parties' litigation of promissory estoppel. The declaratory judgment action therefore serves no independent purpose and is merely duplicative of the promissory estoppel claim. *Etan Industries, Inc. v. Lehmann*, 359 S.W.3d 620, 624 (Tex. 2011) (citing *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 669 (Tex. 2009)). Additionally, the FDJA does not include a fee-shifting or fee recovery provision.

s. The Debtor is not entitled to attorney's fees under any rule, statute, or contract; and

t. The equities favor Tesla.

75. Tesla reserves the right to supplement as discovery progresses.

## TESLA'S ORIGINAL COUNTERCLAIMS[3]

### I. PARTIES

76. Defendant/Counter-Claimant Tesla is a Texas corporation with its principal place of business in Austin, Texas. Tesla has appeared in this suit.

---

[3] Contemporaneously herewith and out of an abundance of caution, Tesla is concurrently filing a motion for relief from the automatic stay for leave to assert its counterclaims solely to the extent the Court determines that the automatic stay otherwise applies. *See* Dkt. No. 52. Tesla does not intend to prosecute the counterclaims unless and until the Court grants Tesla relief from the automatic stay to do so, to the extent it is determined that the automatic stay is applicable. Nor, by bringing its counterclaim, does Tesla intend to waive its right to seek an order from this Court compelling arbitration under contract(s) between the parties and otherwise governing the parties' relationship and the claims herein, and Tesla expressly reserves all rights. Tesla files its

77. Debtor is a Delaware limited liability company that filed a voluntary bankruptcy petition.

## II. JURISDICTION AND VENUE

78. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

79. Venue is proper pursuant to 28 U.S.C. § 1409 because this adversary action arises in, arises under, or is related to the bankruptcy case pending in this District.

## III. FACTUAL ALLEGATIONS IN SUPPORT OF COUNTERCLAIMS

### A. Tesla's Tooling Used By The Debtor At The Anderton Facility Is Critical To Tesla's Cybertruck Production Line.

80. Tesla designs, manufactures, and sells electric vehicles, energy storage systems, and related products and services. Among Tesla's groundbreaking products is the Cybertruck—a next-generation, all-electric pickup truck. Tesla currently maintains a backlog of customer orders for the Cybertruck, and most, if not all, of the Cybertrucks currently in production are already assigned to customers.

81. To build such a groundbreaking vehicle, Tesla must design and manufacture custom parts. Those parts are made using unique Tooling that is manufactured specifically to Tesla's specifications. The custom Tesla Tooling then produces parts that can only be used to build Tesla vehicles.

82. The Debtor is one of the suppliers that used the Tooling to produce parts for Tesla. The Debtor did so at its manufacturing facility located at 222 Lely Drive, Troy, Texas 76579 (the "Anderton Facility"). Its relationship with Tesla is governed, in part, by the Production Purchase

---

compulsory counterclaims in compliance with Fed. R. Civ. P. 13(a) and Fed. R. Bankr. P. 7013 out of an abundance of caution to preserve all rights.

Orders (the "Purchase Orders") that Tesla sends to the Debtor containing the parts and prices of those parts that it needs.

83. Each Purchase Order is accompanied by a "General Terms and Conditions for Procurement of Production and Pre-Production Products" agreement, which is governed by Texas law (the "AAC-Texas GTC"). By beginning performing under the Purchase Order, the Debtor agreed that the AAC-Texas GTC would apply and govern its relationship with Tesla. Among other obligations, the AAC-Texas GTC required the Debtor to deliver parts to Tesla on a timely basis and to the full quantity requested, to immediately notify Tesla of any supply constraints, to provide products conforming to the applicable specifications and free from defects, and that it would ensure its products were compliant with the standards of the Tesla Supplier Handbook (the "Supplier Handbook") that the Debtor was required to acknowledge. Under the AAC-Texas GTC, time of delivery, quantity, and quality are of the essence.

84. The AAC-Texas GTC is not the Debtor's only contractual agreement with Tesla. The Debtor is a part of the Angstrom Group of companies, a multinational group of affiliated entities consisting of parent holding companies, each of which has multiple wholly owned subsidiary companies, all sharing common ownership and control.

85. One of the entities in the Angstrom Group is Angstrom Automotive Group, LLC ("Angstrom Automotive"). On August 31, 2021, Tesla and Angstrom Automotive entered into a supplier contract titled "General Terms and Conditions for Prototype or Production Parts or Services" (the "Angstrom GTC"). Angstrom Automotive executed the Angstrom GTC on behalf of itself and its affiliates, thereby binding the Debtor, among others, to the Angstrom GTC's terms

and obligations. Pursuant to the Angstrom GTC, the Debtor used Tesla's Tooling to produce some of the parts for Tesla's Cybertrucks and Model Y vehicles.

86. Tesla's Tooling that the Debtor used to manufacture these parts under the AAC-Texas GTC and Angstrom GTC was developed specifically for Tesla vehicles. Neither these parts nor the Tooling used to create them are obtainable on the open market.

87. In particular, Tesla's Tooling at the Anderton Facility produced parts (the "Products") that are critical components designed (as relevant to this suit) specifically and exclusively for Tesla's Cybertruck.

88. The Tooling used to manufacture parts at the Anderton Facility was custom-built, extremely complex, and physically substantial; the Tooling in question weighs literally tons. Moving this Tooling to new facilities is burdensome; trying to construct it from scratch is even more so. Each Tooling piece takes approximately five to six months to build.

89. Because of the Tooling's importance, and because of the difficulty of replacing it, Tesla negotiated for specific provisions in the Angstrom GTC to protect its rights to the Tesla Tooling, including the ability to seek injunctive relief and/or enter the Debtor's facilities to take possession of Tesla's property without liability in trespass. The AAC-Texas GTC also required the Debtor to promptly release any of Tesla's property held by the Debtor.

90. Due to the Debtor's ongoing deficient performance as a supplier and failure to cure such deficiencies, described in detail below, Tesla was forced to exercise these rights in July and August 2026, resulting in the repossession of its Tooling from the Anderton Facility on or around August 11, 2026.

91. Before Tesla retrieved its Tooling from the Anderton Facility, Tesla's on-hand inventory of Products was being exhausted and unable to be replenished due to the Debtor's under shipment and, eventually, refusal to ship certain parts at all. Without the Tooling, Tesla would have been unable to manufacture several thousand Cybertrucks that were in or planned for production, most, if not all, of which were already committed to customers.

92. The Debtor was aware that the parts made by the Tooling housed at the Anderton Facility were needed to manufacture Tesla Cybertrucks. Armed with that knowledge, the Debtor deliberately exploited Tesla's attempts to retrieve the Tesla Tooling to exert commercial pressure, effectively holding Tesla's own property for ransom in an effort to extract concessions to which the Debtor had no contractual or legal entitlement.

**B. Tesla Owns the Tooling That Was In The Anderton Facility; The Debtor Has Never Owned That Tooling.**

93. Before the Debtor acquired the Anderton Facility, Tesla had a supplier relationship with non-party Anderton Castings, LLC ("Anderton"). Anderton was a casting and manufacturing supplier that operated out of the Anderton Facility, the assets of which would later be acquired by the Debtor. On March 19, 2021, Tesla and Anderton executed "General Terms and Conditions for Prototype or Production Parts or Services" (the "Anderton GTC"). Upon information and belief, the Anderton GTC and Angstrom GTC are substantially similar.

94. The Anderton GTC is how Tesla ordered, purchased, and owns every piece of Tooling that was held by the Debtor.

95. After signing the Anderton GTC, Tesla devoted significant resources to the development of the Anderton Facility, including but not limited to identifying and developing a particular supplier for Anderton (which was necessary for Anderton to be capable of

manufacturing Tesla Products), developing Anderton's capabilities to be a Tier One automotive supplier, and financing the purchase of supplies for and the building of equipment to manufacture Tesla Products.

96. During the years between signing the Anderton GTC and Anderton or its assets being acquired by the Debtor in or around January 2025, Tesla also engaged in technical work to develop the Anderton Facility's capabilities and equipment.

97. In addition, Tesla devoted extensive engineering resources to the Anderton Facility to develop the manufacturing process for the Cybertruck parts, including by providing review of process flow, cycle time analysis, statistical analysis, and recommendations on machine selection.

98. Specifically, in 2022 and 2023, pursuant to the Anderton GTC, Tesla issued Purchase Orders to Anderton to manufacture the tooling that would be necessary to produce Tesla Products. Each Tooling set was manufactured using a specific combination of die cast tools, trim dies, fixtures, cutting tools, gauge sets, pin presses, x-ray equipment, and other items.

99. Anderton used Tesla's specifications and plans to build the custom Tooling at the Anderton Facility.

100. When Anderton completed manufacturing each Tooling set, it issued a corresponding invoice to Tesla for payment.

101. Anderton invoiced Tesla for all Tooling Purchase Orders, and Tesla paid each Anderton invoice in full.

102. In summary, Anderton manufactured the Tooling to Tesla's specifications. Anderton issued invoices, and Tesla then fully paid for the Tesla Tooling.

103. Tesla owned all Tooling in the Anderton Facility, and Tesla has since retrieved that Tooling.

**C. The Angstrom GTC Expressly Confirms Tesla's Unconditional Ownership Of The Tooling And Its Absolute Right To Retrieve It At Any Time.**

104. At the same time that Tesla was working with Anderton, it also developed a relationship with Angstrom Automotive. On August 31, 2021, Tesla and Angstrom Automotive entered into the Angstrom GTC governing that relationship. Angstrom Automotive executed the Angstrom GTC on behalf of itself and on behalf of each of its affiliates, thereby binding itself and its affiliates—including the Debtor—to the Angstrom GTC's terms, conditions, and obligations.

105. In or around January 2025, the Debtor acquired Anderton, or its assets including the Anderton Facility. The acquisition, which was effective as of December 31, 2024, was announced on January 3, 2025. Upon information and belief, the Debtor's purchase of Anderton thereby led to the Debtor assuming the Anderton GTC. The Debtor did not acquire title to Tesla's Tooling, because Anderton did not have that title to sell.

106. Under the Angstrom GTC, Tesla possesses the unconditional right to take possession of its Tesla Property at the Anderton Facility at any time, with or without cause and without payment of any kind.

107. Tesla's right to possession of the Tooling is absolute. It is not conditioned on the provision of advanced notice to the Debtor, on the existence of a dispute, on the Debtor's consent, or on any payment to the Debtor. Under the Angstrom GTC, "Tesla may retake immediate possession of Tesla Property at any time with or without cause and without payment of any kind." The Angstrom GTC specified that the Debtor's role was that of a bailee in possession of Tesla's

property and that Tesla had the right to recover its property from Debtor without liability in trespass at Debtor's "cost and expense."

108. The Debtor has never owned the Tooling.

109. The Debtor never paid or received a single dollar toward the Tooling's design, manufacture, or acquisition.

110. When the Debtor began to perform under the Angstrom GTC at the Anderton Facility, the Debtor subjected itself to a series of obligations that confirm the Debtor's limited role as a custodian—not an owner—of Tesla's Tooling. Among other things, the Debtor agreed to: use Tesla Property exclusively for the manufacture, storage, and transport of Products for Tesla; clearly mark and identify Tesla Property as belonging to Tesla; refrain from removing Tesla Property from Seller's premises without Tesla's prior written approval; and maintain and safeguard Tesla Property in good condition.

111. The Debtor's only role with respect to the Tooling has been to hold it and use it for the manufacture of Products for Tesla until Tesla demands its return. The Debtor was a bailee at will in possession of Tesla's property, and nothing more.

## D. The Debtor Failed to Perform According to Tesla's Specifications and Standards As Set Forth in The AAC-Texas GTC and Various Other Agreements.

112. Using the Tooling, the Debtor agreed to produce unique parts for Tesla to Tesla's specifications and standards. The Purchase Orders, the Supplier Handbook, the AAC-Texas GTC, the Angstrom GTC, and the Anderton GTC include, or incorporate by reference, Tesla's specifications and standards. The Debtor accepted multiple contracts containing or referencing Tesla's specifications and standards for the parts. Despite the Debtor's knowledge and acceptance

of Tesla's specifications and standard for the parts, the Debtor repeatedly and consistently produced parts for Tesla that failed to meet Tesla's specifications.

113. On or about December 2025, the Debtor began to miss shipments for certain parts owed to Tesla. These missed shipments continued, and by May 2026, the Debtor's tardiness was threatening the ability of Tesla to timely manufacture vehicles. By July, the Debtor had stopped shipment completely on two critical parts. And when it was not missing shipments, the Debtor had a pattern of consistently shipping fewer parts than ordered by Tesla and agreed to by Debtor. Despite its obligations under the AAC-Texas GTC, the Angstrom GTC, and the Anderton GTC, the Debtor failed to immediately notify Tesla of supply constraints, use best efforts to resolve the issue, and prioritize Tesla's releases over orders for other customers. At the time of this filing, the Debtor remains in a substantial backlog of parts owed to Tesla.

114. In addition to the quantity issues, the Debtor's delivery of parts to Tesla was also materially deficient. Some parts sent by the Debtor to Tesla for review did not meet Tesla's standards. For one part alone, the Debtor burdened Tesla with numerous unique or repeating critical quality control issues. The Debtor also exhibited failures to manage its own suppliers, resulting in damage to the parts in transit to the Anderton Facility and, at times, forcing Tesla to accept higher prices to keep production on track. The Debtor's failure to implement compliant shipping and packing practices resulted in damages to parts in transit. Collectively, these failures to provide parts of a sufficient quality to Tesla violated the Debtor's obligations, including its representations and warranties on its parts under the AAC-Texas GTC and duties under the Supplier Handbook to deliver 100% conforming parts.

**E. The Debtor Abruptly Stopped Shipment Of Parts And Denied Tesla's Attempt To Retrieve The Tooling.**

115. On July 13, 2026, the Debtor's deficient performance came to a breaking point when it informed Tesla during a phone call that the Debtor intended to shut down the Anderton Facility and refused to cooperate with Tesla on any exit plan for Tesla's Tooling within the facility.

116. On July 15, 2026, based on the Debtor's under-shipments and its representation that it was shutting down the Anderton Facility coupled with Tesla's need (based on the Debtor's refusal to release parts) to retrieve the Tooling to send it to an alternative supplier, Tesla sent a Demand for Immediate Release of Tesla Property to Angstrom Automotive executives.

117. On July 16, 2026, a representative of both Angstrom Automotive and the Debtor confirmed receipt of Tesla's Demand, but did not respond confirming whether or not Tesla would be permitted access.

118. On July 17, 2026, Tesla provided advance written notice that a Tesla retrieval team would arrive at the Anderton Facility on July 21, 2026 to take possession of Tesla's property.

119. On July 20, 2026, another representative for the Debtor and Angstrom Automotive stated that the Debtor would not permit Tesla to remove any Tesla Tooling from the Anderton Facility on July 21, 2026. He also—for the first time—demanded compensation for alleged (and unspecified and unsubstantiated) modifications to the Tooling that Tesla never requested, authorized, or approved. The Debtor also attempted to condition the continued operation of the Anderton Facility on Tesla paying the Debtor $250,000.00 per week on top of any amounts paid for Purchase Orders *and* that Tesla immediately release payment on all outstanding accounts receivable.

120. That same day, Tesla sent the Debtor a Notice of Property Retrieval, stating that Tesla would be retrieving the Tesla Property from the Anderton Facility on July 21, 2026.

121. On July 21, 2026, Tesla representatives arrived at the Anderton Facility accompanied by a law enforcement officer and a retrieval crew equipped to retrieve Tesla's property. Despite Tesla's clear ownership rights, its repeated written demands, and its advance notice of the retrieval, the Debtor's on-site personnel refused to permit the team to enter the facility, stating that the Debtor's corporate team had instructed them to deny Tesla access.

122. The Debtor's cessation of shipments and refusal to deliver Products to Tesla constituted a failure to perform its obligations under the AAC-Texas GTC, including the obligation to deliver the full quantity of ordered products on the specified delivery dates and to continue performing while any commercial dispute remained pending.

**F. Tesla Was Forced To Obtain A Federal Court Order To Retrieve Its Tooling After The Debtor Refused To Release It.**

123. On July 23, 2026, Tesla filed suit against Angstrom Automotive in the United States District Court for the Western District of Texas, styled *Tesla, Inc. v. Angstrom Automotive Group, LLC*, Cause No. 6:26-cv-00477, asserting claims for breach of contract, anticipatory repudiation, conversion, and trespass to chattels, and seeking a temporary restraining order and writ of replevin (the "Federal Action").

124. That same day, the Debtor filed a petition in the 146th Judicial District Court of Bell County, Texas, styled *Angstrom Aluminum Castings Texas, LLC v. Tesla, Inc.*, Cause No. 26DCV363291, seeking, among other things, a declaratory judgment that Tesla is not entitled to the Tooling and asserting a claim for promissory estoppel (the "State Court Action").

125. In the Federal Action, Angstrom Automotive admitted that Tesla's Tooling was located at the Anderton Facility and at a facility operated by Enforge, LLC in North Carolina.

126. On July 31, 2026, the district court held a hearing on Tesla's motion for a temporary restraining order in the Federal Action.

127. At that hearing, an Angstrom representative testified that the decision to deny Tesla access to the Tooling was made by the controlling person of both Angstrom Automotive and the Debtor, and that the Debtor and/or Angstrom Automotive would not release Tesla's property unless Tesla either capitulated to their commercial demands or obtained a court order compelling them to do so.

128. On August 3, 2026, the district court granted Tesla's motion for a temporary restraining order and writ of replevin, ordering Angstrom Automotive and its affiliates, including the Debtor, to cooperate in releasing the Tooling to Tesla and prohibiting them from concealing, disposing of, damaging, destroying, or removing any Tesla Property. *See* Federal Action, Dkt. No. 40 (the "TRO"). The district court also separately found that the Debtor was subject to the TRO as a party acting in active concert or participation with Angstrom Automotive. *See* TRO ¶ 11.

129. The TRO expressly found that: Tesla's testifying witnesses were credible (TRO ¶ 3); Tesla has a substantial likelihood of success on the merits (*id.* ¶ 4); Tesla will incur irreparable harm if it is not allowed to retrieve the Tooling (*id.* ¶ 5); the balance of hardships favors Tesla (*id.* ¶ 6); granting the requested relief is in the public interest (*id.* ¶ 7); and Tesla owns the Tooling (*id.* ¶ 9). The TRO expressly bound the Debtor as a party in active concert with Angstrom Automotive. TRO ¶ 11.

130. The TRO required the Debtor to use best efforts to complete its preparations of the Tooling for removal by 8:00 p.m. C.T. on August 4, 2026, so that Tesla could begin the removal process at the Anderton Facility at 8:00 a.m. C.T. on August 5. *See* Ex. A to TRO.

131. On the morning of August 4, 2026, Angstrom Automotive filed a motion to stay the TRO in the district court, which denied the motion on the ground that "a stay would substantially injure Tesla in this proceeding given their need for the tooling at issue—[as] discussed at length during the TRO hearing." *See* Federal Action, Dkt. Nos. 20, 28.

132. Later that day, and minutes before its deadline to prepare the Tooling for removal, the Debtor filed for bankruptcy. *See In re Angstrom Aluminum Castings Texas, LLC*, No. 26-11543-cbg, at Dkt. No. 1 (Bankr. W.D. Tex. Aug. 4, 2026). Tesla was thus unable to retrieve its Tooling on August 5 as the TRO contemplated because counsel for Angstrom Automotive asserted that the automatic stay barred it from doing so. *See* Federal Action, Dkt. No. 30 at 1-2 (describing sequence of events).

133. Because it could not retrieve the Tooling, Tesla filed a status report in the district court noting the parties' inability to comply with the TRO. *See id.* A status conference occurred the next day. *See* Federal Action, Dkt. No. 32.

134. Following that hearing, the district court issued an order on August 7 that (i) withdrew the reference of the bankruptcy case "as to all issues relating to the Tesla Tooling," (ii) held that the automatic stay is inapplicable to the Tooling because Tesla owns it and it therefore "does not constitute property of the [Debtor's] estate," (iii) granted Tesla relief from the automatic stay to the extent it applied because the Tooling "is not necessary to an effective reorganization," and (iv) permitted Tesla to "retrieve its Tooling from the Anderton Facility at the earliest

opportunity and [Angstrom Automotive and the Debtor] . . . shall cooperate with that retrieval as set out in the TRO." *See* Federal Action, Dkt. No. 34 at 1-2.

135. Following the district court's order, Angstrom Automotive filed an interlocutory appeal in the Fifth Circuit, styled *Angstrom Automotive Group, LLC v. Tesla, Inc.*, No. 26-50650 (the "Appellate Action"), and an emergency motion to stay the TRO pending appeal. *See* Appellate Action, Dkt. No. 12-1. The Fifth Circuit denied the emergency motion and lifted a brief administrative stay on August 10, 2026. *See* Appellate Action, Dkt. No. 29-2.

136. On August 10, 2026, Tesla retrieved the Tooling from the Anderton Facility—more than three weeks after the Debtor first denied Tesla access to its own property.

137. After Tesla retrieved the Tooling from the Anderton Facility, the Debtor filed an interlocutory appeal of its own in the Fifth Circuit, docketed in the same Appellate Action, and sought an administrative stay, stay pending appeal, and a writ of mandamus concerning the district court's order lifting the automatic stay. *See* Appellate Action, Dkt. No. 39.

138. On August 11, 2026, the Fifth Circuit denied the Debtor's emergency motion for stay pending appeal, denied the Debtor's request for writ of mandamus, and denied the Debtor's motion for administrative stay as moot. *See* Appellate Action, Dkt. No. 50-1.

139. Two days later, on August 12, 2026, Tesla retrieved the remaining Tooling located at the Enforge, LLC facility in North Carolina.

140. On August 12, 2026, the United States Bankruptcy Court for the Western District of Texas, Austin Division transferred and reassigned the Debtor's bankruptcy case to the United States Bankruptcy Court for the Western District of Texas, Waco Division. *See In re Angstrom*

*Aluminum Castings Texas, LLC*, No. 26-11543-cbg, at Dkt. No. 16 (Bankr. W.D. Tex. Aug. 12, 2026).

141. On August 21, 2026, Tesla removed the State Court Action to this Court and instituted the above-captioned adversary proceeding. *See* Dkt. No. 1.

**G. Tesla Has Suffered Harm as a Result of the Debtor's Conduct.**

142. To retrieve the Tooling, Tesla incurred significant costs and expenses, including the cost of retaining a rigging company, flatbed trucks, forklifts, and retrieval crews.

143. Once the Tooling was retrieved, Tesla became aware that the Tooling had been poorly maintained and was damaged and/or modified without Tesla's consent.

144. Angstrom's refusal to permit Tesla to retrieve its Tooling from the Anderton Facility caused Tesla harm.

145. Before ceasing production, the Debtor used the Tesla Tooling to manufacture approximately 700 Tesla products that were scheduled to ship to Tesla on July 17, 2026; those Tesla Products were, upon information and belief, being held at the Anderton Facility by the Debtor.

146. The Debtor abruptly cancelled the shipment of those 700 Tesla products and refused further deliveries required under the Angstrom GTC, resulting in the depletion of Tesla's on-hand supply.

147. Against the backdrop of lowered products in its possession, immediate access to the Tesla Tooling was necessary to avoid or at least minimize production delays; Tesla had several thousand Cybertrucks that were in or planned for production—most of which were already assigned to customers, and nearly as many employees at the ready to produce them.

148. The Debtor's failure to timely return Tesla's Tooling caused harm to Tesla.

149. As a direct and proximate result of the Debtor's wrongful conduct, Tesla has suffered substantial damages, including but not limited to: (a) attorneys' fees and legal costs incurred in connection with this action and the related Federal Action necessary to obtain access to its Tooling; (b) costs and expenses incurred in connection with Tesla's multiple attempts to retrieve the Tooling, including the cost of retaining a rigging company, flatbed trucks, forklifts, and retrieval crews; (c) the time and expense of Tesla employees devoted to managing the Debtor's refusal to release the Tooling and coordinating the eventual retrieval; (d) costs incurred in inspecting, transporting, and repairing the Tooling following retrieval, including costs attributable to degradation of the Tooling during the period it was wrongfully withheld; and (e) production losses, reputational harm, and other damages arising from the Debtor's refusal to release the Tooling and its cancellation of scheduled parts shipments.

## IV. CAUSES OF ACTION

### COUNT ONE:
### BREACH OF CONTRACT
### (ANGSTROM GTC AND, TO THE EXTENT APPLICABLE, ANDERTON GTC)

150. Tesla incorporates by reference the preceding allegations as if fully set forth in this paragraph.

151. On August 31, 2021, Tesla and Angstrom Automotive entered into a valid, enforceable, and binding contract. Angstrom Automotive executed the Angstrom GTC on behalf of itself and its affiliates, thereby binding the Debtor to the Angstrom GTC's terms and obligations.

152. The Angstrom GTC is a valid, enforceable agreement between Tesla and Angstrom Automotive and its affiliates. Angstrom Automotive executed the Angstrom GTC on behalf of

itself and its affiliates, thereby binding them—including the Debtor—to the Angstrom GTC's terms and obligations.[4]

153. Under the Angstrom GTC, Tesla owns the Tooling that was located at the Anderton Facility and has the contractual right to retrieve it at any time, with or without cause and without payment of any kind.

154. Tesla fully performed all of its obligations under the Angstrom GTC, or was ready, willing, and able to perform, except to the extent its performance was prevented, hindered, or rendered impossible by the Debtor's conduct.

155. The Debtor materially breached the Angstrom GTC by repeatedly refusing to permit Tesla to retrieve its Tooling from the Anderton Facility, including by physically turning Tesla's employees and crew away, in direct contravention of Tesla's contractual right to do so, and failing to maintain the Tooling in good condition during the period of wrongful retention.

156. Under the Angstrom GTC, the Debtor is liable to Tesla for all direct damages, incidental damages, and other reasonably foreseeable damages caused by the Debtor's breach, including costs of containment, cover, and replacement, as well as costs and expenses incurred by Tesla in connection with the Debtor's breach.

157. Tesla has complied with all conditions precedent to bringing this action, or such conditions have been waived, excused, or rendered futile by the Debtor's conduct.

---

[4] To the extent that the Debtor and/or Angstrom Automotive adopted, assumed, or otherwise became bound by the Anderton GTC, the Debtor also breached the Anderton GTC as it is substantially similar to the Angstrom GTC.

158. As a direct and proximate result of the Debtor's material breaches, Tesla has suffered substantial harm, including irreparable harm prior to the retrieval of the Tooling, as well as direct damages, incidental damages, costs of cover, attorneys' fees, retrieval costs, employee time, costs of inspecting and repairing the Tooling, costs related to production delays, reputational harm, and other costs and expenses incurred in connection with the Debtor's breach, all as recoverable under the Angstrom GTC and applicable law.

159. Tesla also seeks recovery of its attorney's fees pursuant to statute and its contractual rights.

160. Section 12.5 of the Angstrom GTC, which is governed by California law, establishes that Tesla may obtain a court order for possession of the Tooling and enter the Debtor's property to take possession of the tooling at the "cost and expense" of the *Debtor*.

161. Courts applying California law have held that, under a "common sense reading," a contractual provision providing for "reasonable collection costs" incurred when it is "necessary … to initiate legal proceedings" implicitly includes attorney's fees. *Oklahoma Fixture Co. v. Ask Computer Sys., Inc.*, 45 F.3d 380, 382 (10th Cir. 1995); *see also Mastronardi Int'l Ltd. v. SunSelect Produce (California), Inc.*, No. 1:18-cv-00737-AWI-JLT, 2019 WL 3996608 (E.D. Cal. Aug. 23, 2019), at *12 (holding that the contractual phrases "the cost of any defense" and "all costs incurred by [by a party in enforcing indemnity obligations]" included attorney's fees); *Aman Truck Lines, LLC v. MST Ins. Servs., Inc.*, No. 2:21-CV-01279-DJC-JDP, 2026 WL 234953, at *2 (E.D. Cal. Jan. 29, 2026) (similar).

162. Accordingly, because the Angstrom GTC provides for Tesla's "cost[s] and expense[s]" in retrieving the Tooling, it is entitled to attorney's fees it necessarily incurred to retrieve the Tooling.

**COUNT TWO:**
**BREACH OF CONTRACT**
**(AAC-TEXAS GTC AND PURCHASE ORDERS)**

163. Tesla incorporates by reference the preceding allegations as if fully set forth in this paragraph.

164. The Purchase Orders issued by Tesla to the Debtor, together with the AAC-Texas GTC incorporated therein, form valid, binding, and enforceable contracts between Tesla and the Debtor (collectively, the "AAC-Texas Contracts").

165. The Debtor accepted each Purchase Order and the AAC-Texas GTC by commencing and continuing performance thereunder. Each accepted Purchase Order, together with its associated Releases and the AAC-Texas GTC, is a separate, enforceable contract forming part of the AAC-Texas Contracts.

166. The AAC-Texas Contracts are governed by the laws of the State of Texas, without regard to conflicts of law principles.

167. Time of delivery, quantity, and quality are of the essence under the AAC-Texas Contracts, and the Debtor is obligated, among other things, to deliver conforming Products on the dates and in the quantities specified, to immediately notify Tesla of any supply constraints, and to ensure compliance with the Supplier Handbook.

168. Tesla fully performed all of its obligations under the AAC-Texas Contracts, or was ready, willing, and able to perform, except to the extent its performance was prevented, hindered, or rendered impossible by the Debtor's conduct.

169. The Debtor has materially breached the AAC-Texas Contracts, including by failing to deliver the full quantity of ordered Products and failing to meet required delivery dates, stopping and reducing shipments of Products without providing the notice or prioritization required under the AAC-Texas GTC, failing to ensure that its Products adhered to the representations and warranties it made, and delivering Products that failed to conform to Tesla's specifications.

170. Under the AAC-Texas Contracts, the Debtor is liable to Tesla for all direct damages, incidental damages, and other reasonably foreseeable damages caused by the Debtor's breach, including costs and expenses incurred by Tesla in connection with the Debtor's breach.

171. Tesla has complied with all conditions precedent to bringing this action, or such conditions have been waived, excused, or rendered futile by the Debtor's conduct.

172. As a direct and proximate result of the Debtor's material breaches, Tesla has suffered substantial harm, including direct damages, incidental damages, costs of cover, retrieval and resourcing costs, employee time, and other costs and expenses incurred in connection with the Debtor's breach, all as recoverable under the AAC-Texas Contracts and applicable law.

173. Tesla also seeks recovery of its attorney's fees pursuant to Texas Civil Practice & Remedies Code Section 38.001.

174. Texas Civil Practice & Remedies Code Section 38.001(b) establishes that "[a] person may recover reasonable attorney's fees from an individual or organization … in addition

to the amount of a valid claim and costs, if the claim is for … an oral or written contract." Tex. Civ. Prac. & Rem. Code Ann. § 38.001(b).

175. Tesla has fulfilled the procedural requirements of Texas Civil Practice & Remedies Code Section 38.002 to recover attorney's fees. Section 38.002 requires that "(1) the claimant . . . be represented by an attorney; (2) the claimant . . . present the claim to the opposing party or to a duly authorized agent of the opposing party; and (3) payment for the just amount owed . . . not have been tendered before the expiration of the 30th day after the claim is presented." Tex. Civ. Prac. & Rem. Code Ann. § 38.002.

176. Tesla is represented by an attorney.

177. Tesla presented its claim for performance in its demand letters to Angstrom. *See Criton Corp. v. Highlands Ins. Co.*, 809 S.W.2d 355, 358 (Tex. App.—Houston [14th Dist.] 1991, writ denied) (holding that requests for performance are sufficient to meet the presentment requirement of § 38.002).

178. Angstrom never tendered performance. Rather, Tesla retrieved the Tooling pursuant to a court order that Angstrom unsuccessfully opposed and sought to appeal. Accordingly, all three conditions are satisfied for Tesla to recover attorney's fees pursuant to Sections 38.001 and 38.002.

**COUNT THREE:**
**CONVERSION**

179. Tesla incorporates by reference the preceding allegations as if fully set forth in this paragraph.

180. Tesla owns the Tooling formerly located at the Anderton Facility.

181. By refusing to allow Tesla to retrieve its Tooling and by keeping the Tooling at the Anderton Facility, the Debtor assumed and exercised unauthorized dominion and control over that property to the exclusion of Tesla's ownership rights, and did so in conjunction with or at the direction of Angstrom Automotive and/or other controlling entities or persons within the Angstrom Group.

182. Tesla made repeated requests and demands for the Debtor to return the Tooling.

183. Despite those requests and demands, the Debtor refused to return the Tooling to Tesla until compelled to do so by order of the United States District Court for the Western District of Texas.

184. As a direct and proximate result of the Debtor's conversion of Tesla's property, Tesla has suffered substantial damages.

185. Tesla also seeks recovery of its attorney's fees pursuant to Texas Civil Practice & Remedies Code Section 38.001.

186. Under Texas law, where a conversion claim is "intrinsically founded in the interpretation of a contract" or otherwise "so intertwined with the contract which underlies th[e] cause of action," then a claimant "would be entitled to recover attorney's fees" under Section 38.001(b)(8). *High Plains Wire Line Servs., Inc. v. Hysell Wire Line Serv., Inc.*, 802 S.W.2d 406, 408 (Tex. App.—Amarillo 1991, no writ); *see also Exxon Corp. v. Bell*, 695 S.W.2d 788, 791 (Tex. App.—Texarkana 1985, no writ) (awarding attorney's fees for conversion claim because its resolution "depended entirely on … contractual interpretation"); *Mustang Trading, Inc. v. Agharanya*, No. 05-91-00659-CV, 1992 WL 106034, at *2 (Tex. App.—Dallas May 19, 1992, no

writ) (awarding attorney's fees for a conversion action that was "sufficiently founded upon a contract").

187. Here, Angstrom's conversion of the Tooling was "intrinsically founded in" and "so intertwined with" the interpretation of the Angstrom GTC and the AAC-Texas GTC. Accordingly, Tesla is entitled to recover attorney's fees for its conversion claim pursuant to Texas Civil Practice & Remedies Code Section 38.001(b)(8).

188. Tesla has fulfilled the procedural requirements of Texas Civil Practice & Remedies Code Section 38.002 for the reasons stated above, *see supra* ¶¶ 176–79.

**COUNT FOUR:**
**TRESPASS TO CHATTELS**

189. Tesla incorporates by reference the preceding allegations as if fully set forth in this paragraph.

190. Tesla owns the Tooling formerly located at the Anderton Facility in Troy, Texas.

191. Tesla sent multiple requests and demand letters to the Debtor demanding that it be allowed into the Anderton Facility to retrieve its Tooling.

192. Tesla also attempted to possess and/or use the Tesla Tooling on July 21, 2026, by sending a representative and a crew, escorted by law enforcement, to retrieve its property.

193. The Debtor denied Tesla access to the Tesla Tooling and otherwise prevented Tesla from removing the Tooling from the Anderton Facility on July 21, 2026 and before.

194. Tesla had a right under the Angstrom GTC, the Anderton GTC, and the AAC-Texas Contracts to access the Anderton Facility at any time to retrieve its Tooling.

195. The Debtor's denial and prevention deprived Tesla of the use or possession of the Tooling; the Debtor's actions to retain possession of the Tesla Tooling were wrongful.

196. As alleged above, Tesla needed to possess the Tooling to prevent irreparable harm, which harm in fact materialized as a result of the Debtor's wrongful conduct.

197. The Debtor's refusal prevented Tesla from possessing the Tooling until August 10, 2026.

198. Given the critical nature of the Tooling to Tesla's Cybertruck production line and the dwindling on-hand supply of Products during the period of wrongful retention, the Debtor's wrongful interference with Tesla's right to possess the Tooling deprived Tesla of possession for a substantial period of time, causing Tesla to suffer production disruptions, supply chain harm, and other damages.

199. Therefore, by continuing to retain the Tesla Tooling after Tesla made a demand for it, the Debtor committed a trespass to chattels.

200. As a direct and proximate result of the Debtor's trespass to chattels, Tesla has suffered substantial damages.

**COUNT FIVE:**
**TEXAS THEFT LIABILITY ACT**
**(Texas Civil Practice & Remedies Code Chapter 134)**

201. Tesla incorporates by reference the preceding allegations as if fully set forth in this paragraph.

202. Tesla owns the Tooling formerly located at the Anderton Facility and therefore held the superior right to immediate possession of the Tooling, and Tesla owned the Tooling at all times from the Tooling's inception. Debtor never acquired title or an ownership stake in the Tooling.

203. Tesla made repeated requests and demands for the Debtor to release the Tooling to Tesla.

204. By refusing to allow Tesla to retrieve its Tooling and by keeping the Tooling at the Anderton Facility, the Debtor unlawfully appropriated the Tooling.

205. Debtor did not have ownership rights to the Tooling, but continued to retain the Tooling without Tesla's consent and without any valid contractual or legal authority, and did so at the direction of Angstrom Automotive and/or other controlling entities or persons within the Angstrom Group.

206. Despite those requests and demands, the Debtor refused to return the Tooling to Tesla until compelled to do so by order of the United States District Court for the Western District of Texas.

207. Debtor's appropriation of the Tooling was done with intent to deprive Tesla of the Tooling. Under Texas law, unlawfully exercising control over property in order to extract monetary payments from the owner amounts to appropriating the property with an intent to deprive. *Raitano v. State*, No. 14-07-00931-CR, 2009 WL 975957 (Tex. App.—Houston [14th Dist.] Feb. 26, 2009, no pet.).

208. As a direct and proximate result of the Debtor's theft of Tesla's property, Tesla has suffered substantial damages. Tesla seeks the recovery of its actual damages, costs, and reasonable and necessary attorneys' fees pursuant to Texas Civil Practice & Remedies Code § 134.005.

**COUNT SIX:**
**IN THE ALTERNATIVE, PROMISSORY ESTOPPEL**

209. Tesla incorporates by reference the preceding allegations as if fully set forth in this paragraph.

210. Tesla asserts its promissory estoppel claim only in the alternative. Tesla maintains that enforceable contracts govern the parties' relationship, the claims in the Original Petition, and

the counterclaims herein, and that all rights, remedies, and obligations under the contracts are enforceable, including the right to arbitrate all claims herein.

211. The Debtor made a clear and specific promise to Tesla to manufacture Tesla's parts using Tesla's Tooling—always the property of Tesla—to Tesla's specifications in the quantities as demanded by Tesla from time to time. Upon purchasing the Anderton Facility, the Debtor immediately began providing Tesla parts upon receipt of Purchase Orders from Tesla and continued to perform for over a year. At all times the Debtor represented to Tesla that it was willing and able to manufacture parts for Tesla using the Tooling in the quantities demanded by Tesla. The Debtor reinforced this promise through a sustained course of conduct, including by accepting and fulfilling Purchase Orders, maintaining the Tooling at the Anderton Facility for the purpose of manufacturing Tesla's Products, and holding itself out as a reliable and continuing source of supply for Tesla's production needs.

212. Tesla continued sending purchase orders to the Debtor and using the parts produced by the Debtor's use of the Tooling in reliance on the Debtor's promise to manufacture parts to Tesla's specifications in the quantities demanded by Tesla. Tesla planned its production schedules around its reliance on the Debtor's promise to produce timely and quality parts in the quantity demanded by Tesla. In reliance on the Debtor's promise, Tesla committed substantial resources to its Cybertruck production line, including scheduling several thousand vehicles for production.

213. The Debtor should have, and did, reasonably foresee that Tesla would rely on Debtor's promise, including for the supply of parts for the Cybertruck.

214. Tesla substantially and justifiably relied on Debtor's promise to its detriment.

215. The Debtor failed to honor its promise by, among other actions, failing to release Tesla's proprietary Tooling to Tesla, failing to manufacture parts to Tesla's specifications as demanded by Tesla, and failing to manufacture parts at the demand of Tesla. Instead of fulfilling its promise to Tesla, Debtor wrongfully retained Tesla's Tooling, effectively holding it ransom to negotiate a guaranteed volume contract rather than honor its on-demand manufacturing promise to Tesla.

216. Tesla has been damaged as a direct and proximate result of the Debtor's promise to Tesla, Tesla's reasonable, substantial, and justifiable reliance thereon, and the Debtor's failure to fulfill its promise.

217. Injustice may only be avoided by enforcing Debtor's promise to Tesla and by compensating Tesla for Debtor's breach of its promise to Tesla.

**COUNT SEVEN:**
**IN THE ALTERNATIVE, TORTIOUS INTERFERENCE WITH EXISTING CONTRACT**

218. Tesla incorporates by reference the preceding allegations as if fully set forth in this paragraph.

219. Tesla asserts its tortious interference claim only in the alternative should the Court find that the Debtor is not bound by the Angstrom GTC.[5] Tesla maintains that multiple enforceable contracts govern the parties' relationship, the claims in the Original Petition, and the counterclaims

[5] To the extent the Court finds that the Debtor and/or Angstrom Automotive did not adopt, assume, or otherwise became bound by the Anderton GTC, Tesla incorporates the Anderton GTC herein and seeks recovery for interference with Tesla's rights under the Anderton GTC.

herein, and that all rights, remedies, and obligations under the contracts are enforceable, including the right to arbitrate all claims herein.

220. The Debtor has intentionally interfered with Tesla's contractual rights under the Angstrom GTC by failing to release Tesla's Tooling to Tesla and failing to maintain the Tooling in good condition during the period of wrongful retention.

221. The Debtor's interference with Tesla's rights undermines Tesla's contractual and economic interests, including the benefit of contractual provisions negotiated by Tesla to prevent the withholding of its Tooling and to compensate Tesla for any withholding in breach of the Angstrom GTC.

222. Debtor's interference with Tesla's contractual rights was willful and intentional. The Debtor was explicitly made aware of Tesla's contractual rights concerning the Tooling and chose to willfully withhold that Tooling in any event.

223. Debtor's interference with Tesla's contractual rights directly and proximately caused Tesla actual damages, including loss of contractual performance and the incurrence of substantial costs and attorney's fees to enforce Tesla's contractual rights.

224. Tesla seeks recovery of actual damages related to Debtor's interference with Tesla's contractual rights under the Angstrom GTC. The Debtor's acts and omissions described herein were willful, wanton, malicious, and carried out with conscious indifference to Tesla's rights. Accordingly, Tesla is also entitled to recover exemplary damages in an amount to be determined at trial.

## V. JURY DEMAND

225. Tesla requests a jury trial of all issues in this action.

## VI. PRAYER

Tesla, Inc. prays that the Debtor take nothing by its claims and that Tesla, Inc. recover all sums requested under Tesla, Inc.'s counterclaim and all attorney's fees and costs, together with such other and further relief, both general and special, at law and in equity, to which it may be justly entitled.

Dated: August 28, 2026

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

*/s/ Jason L. Boland*
Jason L. Boland
Texas Bar No. 24040542
jason.boland@nortonrosefulbright.com
1550 Lamar St., Suite 2000
Houston, TX 77010
Telephone: (713) 651-3769
Facsimile: (713) 651-5246

Marc B. Collier
Texas Bar No. 00792418
marc.collier@nortonrosefulbright.com
Ethan Glenn
Texas Bar No. 24101810
ethan.glenn@nortonrosefulbright.com
Kayla Ahmed
Texas Bar No. 24136691
kayla.ahmed@nortonrosefulbright.com
98 San Jacinto Boulevard, Suite 1100
Austin, TX 78701-4255
Telephone: (512) 474-5201
Facsimile: (512) 536-4598

*Counsel for Tesla, Inc.*

## CERTIFICATE OF SERVICE

I certify that on August 28, 2026 a true and correct copy of the foregoing Answer to Original Petition and Original Counterclaim was served by this Court's CM/ECF system on all parties registered to receive such notice in the above-captioned case.

*/s/ Jason Boland*________
Jason Boland